MILLER et al. v. UNITED STATES.

No. 9680.

Circuit Court of Appeals, Ninth Circuit.

Jan. 22, 1942.

GARRECHT, Circuit Judge, dissenting in part.

J. Oscar Goldstein and Burton J. Goldstein, both of Chico, Cal., and Carr & Kennedy and R. P. Stimmel, all of Redding, Cal., for appellants.

Norman M. Littell, Asst. Atty. Gen., Charles R. Denny, John F. Cotter, and Jacob N. Wasserman, Attys., Department of Justice, all of Washington, D. C., Frank J. Hennessy, U. S. Atty., and R. McMillan, Asst. U. S. Atty., both of San Francisco, Cal., and C. U. Landrum, Sp. Asst. to U. S. Atty., of Detroit Lakes, Minn., for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

The United States Government, through its Secretary of the Interior, seeks by action in eminent domain to acquire several parcels of land for the relocation of the main line of the Central Pacific Railway Company between Redding and Delta, in Shasta County, California. Such relocation of the railway is made necessary through the construction of the Shasta Dam, a feature of the so-called Central Valley Project.

The several Acts of Congress relative to the project as cited and epitomized in the margin[1] are intended as a part of the statement of fact upon which this opinion is based.

The record does not disclose the date of filing the original complaint herein, but the amended complaint was filed December 14, 1938. On the same day a declaration of taking in accordance with the Act of Congress (40 U.S.C.A. § 258a) was filed, and a judgment upon said declaration of taking

---

1 Act approved June 17, 1902, 32 Stat. 388, which established a "reclamation fund" for the construction and maintenance of irrigation works for the storage, diversion and development of waters for the reclamation of arid and semiarid lands in certain states, including California.

Joint Resolution approved April 8, 1935, 49 Stat. 115, which appropriated certain sums for relief purposes, including, inter alia, "water conservation, transmountain water diversion and irrigation and reclamation".

Act approved August 30, 1935, 49 Stat. 1028, authorizing the construction, repair and preservation of certain public works on rivers and harbors, and other purposes. By this Act it was enacted "that the following works of improvement of rivers, harbors, * * * are hereby adopted and authorized, to be prosecuted under the direction of the Secretary of War * * * in accordance with the plans recommended in the respective reports hereinafter designated and subject to the conditions set forth in such documents * * * Sacramento River, California; Rivers and Harbors Committee Document Numbered 35, Seventy-third Congress; * * *"

Act approved June 22, 1936, 49 Stat. 1622, which was a general appropriation bill, appropriating funds for the Central Valley Project, California, together with other projects.

Act approved August 26, 1937, 50 Stat. 844, authorizing the construction, repair and preservation of certain public works on rivers and harbors. Section 2 of this Act provided "that the $12,000,000 recommended for expenditure for a part of the Central Valley project, California, in accordance with the plans set forth in Rivers and Harbors Committee Document Numbered 35, Seventy-third Congress, and adopted and authorized by the provisions of section 1 of the Act of August 30, 1935 (49 Stat. 1028, at 1038), entitled 'An Act authorizing the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes', shall, when appropriated, be available for expenditure in accordance with the said plans by the Secretary of the Interior instead of the Secretary of War: Provided, That the transfer of authority from the Secretary of War to the Secretary of the Interior shall not render the expenditure of this fund reimbursible under the reclamation law: Provided further, That the entire Central Valley project, California, heretofore authorized and established under the provisions of the Emergency Relief Appropriation Act of 1935 (49 Stat. 115) and the First Deficiency Appropriation Act, fiscal year 1936 (49 Stat. 1622), is hereby reauthorized and declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian Reservations, and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings * * *". 50 Stat. 850.

Act approved May 9, 1938, 52 Stat. 291, 324, which appropriated funds for, inter alia, "continuation of construction of the following projects and for general investigation * * * Central Valley project, California, $9,000,000, together with the unexpended balance of the appropriation for this project contained in the * * * Appropriation Act * * * with authority in connection with the construction of the Central Valley project, California, (1) to purchase or condemn and to improve suitable land for relocation of highways, roadways, railroads, telegraph, telephone, or electric transmission lines or other properties the relocation of which, in the judgment of the Secretary of the Interior, will be necessitated by construction or operation and maintenance of said project, * * *".

was made and entered in the District Court.

Following the filing of the declaration of taking and the entry of the judgment based thereon, the Government took possession of the properties in question. Issues as to the value of the lands taken and the damages suffered by reason of the taking were the subjects of trial in the District Court January 29, 1940.

By its judgment the District Court, in addition to awarding judgment for compensation for the lands taken in accordance with the verdict of the jury, went outside the issues tried and summarily gave judgment in favor of the Government against three of the land owners for $650, this being the sum deposited in Court over and above the jury awards.

Certain of the defendants in the action, including those against whom the $650 judgment to the Government was awarded, appeal, claiming that prejudicial error occurred during the trial and that the Court was without jurisdiction to decree the judgment of $650. That the Court was without the jurisdiction to enter such judgment is so obvious that we so hold without further discussion and shall not herein refer to that subject again except to designate the scope of our decision.

The other claimed errors relate to the rulings on evidence and instructions to the jury, and they arise from the Court's holding that the fair market value of the lands taken on December 14, 1938 (date of the judgment on the declaration of taking) was to be established without taking into consideration any increase in value which occurred after the passage of the Central Valley project authorization Act of August 26, 1937. There is no point made that increase in value occurred from any special cause. It is apparent from the objections made, the argument upon the objections and the Court's remarks and instructions to the jury, that all parties had in mind only such increase in value as occurred merely because of the passage of the Act.

This question arose at the trial in several different manners. Appellants sought to give evidence as to sales of other lands in the neighborhood made after the passage of the Act or after August 26, 1937, and this evidence was excluded. They endeavored to prove the fair market value of their lands on the date of the taking without excluding any increase in value subsequent to the passage of the Act; and they objected to the Government's witnesses so qualifying their testimony. It must be borne in mind at all times that none of the lands, the subject of this action, were lands contemplated for use by the Government in the terms of the Act.

The district judge consistently ruled that the appellants were not entitled to any such increase in value and so instructed the jury.

The following excerpts from the record will serve to illustrate:

"Q. (To John J. Humphrey, Sr., one of the appellants herein). Are you part owner of what has been described here as the Rouge tract * * *? A. Yes, Sir.

* * *

"Q. Were you the owner of an undivided one-third interest in that property on December 14, 1938, and prior thereto? A. Yes, Sir.

"Q. Some time prior thereto? A. Yes, Sir.

* * *

"Q. Now, then, did you yourself make sales of parcels of real estate—answer this yes or no—in that vicinity? A. Yes, Sir.

"Mr. Landrum (Attorney for the Government): That is objected to on the ground and for the reason it is indefinite as to time.

"The Court: Fix the time.

"Q. Prior to December 14, 1938.

"Mr. Landrum: That is objected to upon the ground and for the reason it is incompetent, irrelevant and immaterial, and includes a time subsequent to the Act of Congress. It is our position, your Honor, and in order that it may be perfectly plain for the record, this case is controlled by the Shoemaker case, a decision of the Supreme Court of the United States, wherein the Supreme Court held that they could not show sales of land in the vicinity made subsequent to the Act of Congress creating Rock Creek Park, and it is our position their sales must be prior to the time of the Act of Congress establishing this project. * * *

"The Court: The objection is sustained.

"Q. Mr. Humphrey, directing your attention to the tract referred to as Parcel No. 1, the Rouge tract, which I asked you about prior to the time that the matter came up before the Court, you say that you

were one of the owners of that tract of land on December 14, 1938? A. Yes, Sir.

"Q. I will ask you to state what was the fair market value of that particular piece of land or that tract of land on December 14, 1938?

"Mr. Landrum: Just a moment, that is objected to on the ground and for the reason it is incompetent, irrelevant and immaterial, no foundation laid, on the further ground and further reason that it includes within itself any increased value in this property due to the Central Valley project.

"Mr. Goldstein (Attorney for the appellants): If the Court please, I am going to answer Counsel's objection two fold: First of all, his objection with relation to foundation. Your Honor is entirely familiar with the law of California that an owner can testify as to the value of his own property, whether real or personal, and no foundation need be laid. The second ground of objection, with reference to the matter of the inclusion of any values claimed by Counsel is a matter of cross examination and not upon the preliminary question of market value of the property.

"Mr. Landrum: Your Honor, that is precisely the same thing, that is precisely covered by the very question which your Honor sustained my objection to. My objection to this question—and it is important—goes to its form, in that it doesn't eliminate from the answer any increased value over the value of the property due to the Central Valley project. If he will ask the value, forgetting—excluding any increase in the value due to the project, I will have no objection, but his question is going right back to the very thing the Supreme Court in the Shoemaker case says he can't do.

* * *

"The Court: I rule that the objection is sustained."

Similar rulings were made upon objections to testimony of expert witnesses attempting to testify as to the value of the property as of the date of the taking.

To put it simply, the Court ruled that no evidence could come in as to sales of similar properties after August 26, 1937, and that qualified witnesses testifying as to the value of the land on the date of the taking must subtract from this valuation any increment in value after August 26, 1937:

### Admissibility of Evidence of Other Sales

The case of Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 392, 37 L.Ed. 170, is relied upon by the Government in support of its position that the trial court's rulings were correct.

In the cited case the condemnation proceedings were instituted under the authority of an Act of Congress approved September 27, 1890, 26 Stat. 492, "authorizing the establishing of a public park in the District of Columbia" and directing that a tract of land lying on both sides of Rock Creek, and within certain limits named in the Act be secured as thereinafter set out, and be perpetually dedicated and set apart as a public park or pleasure ground for the benefit and enjoyment of the people of the United States.

The Supreme Court approved of two instructions, reading:

"The commissioners are instructed that they shall receive no evidence tending to prove the prices actually paid on sales of property similar to that included in said park, and so situated as to adjoin it or to be within its immediate vicinity, when such sales have taken place since the passage of the act of Congress of the 27th of September, 1890, authorizing said park; but any recent bona fide sales made before the passage of said act, of lots similarly situated and adapted to similar uses, or recent bona fide contracts made before the passage of said act, with landowners, for other lands in the vicinity similarly situated, may be considered by the commissioners, looking at all the circumstances of these sales or contracts in the determination of the ultimate question of value."

And "The commissioners are further instructed that they shall be governed in their inquiry in making their valuations by the following considerations: What are the lands within the park limits now worth in cash, or in terms equivalent to cash, in the market, if a market now exists for such lands? * * * They are not at liberty to place a value upon these lands upon the basis of what one might be willing to buy them on time for purely speculative purposes; nor can they consider the value given them by the establishing the park; and they are to make their valuation without consideration of the fact that a specific amount of money is appropriated

by the act of Congress of 27th September, 1890."

In answer to the property owners' contention that these instructions were improper, the Court said (page 305 of 147 U.S., page 393 of 13 S.Ct., 37 L.Ed. 170): "While the board should be allowed a wide field in which to extend their investigation, yet it has never been held that they can go outside of the immediate duty before them, viz. to appraise the tracts of land proposed to be taken, by receiving evidence of conjectural or speculative values, based upon the anticipated effect of the proceedings under which the condemnation is had. Kerr v. [South Park] Commissioners, 117 U.S. [379], 380, 6 S.Ct. 801 [29 L.Ed. 924]."

An analysis of the Kerr case cited by the Supreme Court clearly indicates the bases upon which the instruction objected to was upheld. There, too, the condemnation was for the purpose of a public park. We quote (page 384 of 117 U.S., page 804 of 6 S.Ct., 29 L.Ed. 924):

"On the trial of the issue before the jury as to the value of the land in question taken by the appellees for the purposes of the park, the appellants offered to prove, as tending to show the value of their land, the prices which had been actually paid on sales of similar property situated so as to adjoin the park, or be within its immediate vicinity,—*sales which had taken place after the lines of the park boundaries had been definitely ascertained and laid out.* This evidence was rejected, and this ruling, together with the charge of the court to the jury on the point, are assigned as error to the prejudice of the appellants.

"The portions of the charge of the court to the jury objected to on that ground are as follows:

" 'A number of witnesses testified that the agitation of the park project, the anticipation that the legislature would authorize the appropriation of lands to establish a park in the vicinity of the present South park, and the introduction of the bill into the legislature, which finally became a law on the ——— day of February, 1869, materially enhanced the value of lands embraced in the present park lines, as well as the lands adjacent thereto and in that vicinity. *Any resulting benefits to the lands within the proposed park from this and other causes—such as the growth and prosperity, or the anticipated growth and prosperity, of the city of Chicago—you should take in account in determining the amount that will fairly compensate the owner.* But a number of witnesses also testified, and there seemed to be less agreement upon this point than upon some others, that the passage of the park act, its ratification by the people, and the fixing of the proposed park boundaries by the legislature, gave to the lands immediately fronting upon and in the vicinity of the park, including the Midway plaisance and the boulevards, an additional value solely on account of their being without the proposed park lines, but adjacent to the park, the plaisance, and the boulevards, or near enough thereto to receive the special benefits resulting from such improvements. *In the nature of things the lands within the proposed park, and which were to constitute it, could not have been thus specially benefited,* and the owner of the lands in question should be allowed nothing on the ground that his property was thus specially benefited.

* * *

" 'Sales of property of like character and quality, similarly situated and affected by the same causes, made under circumstances likely to produce competition among bidders, are sometimes resorted to in determining the value of lands; *but inasmuch as the lands adjacent to and in the vicinity of the park, plaisance, and boulevards received a special benefit, and were subject to a special burden by reason of the existence of the park, plaisance, and boulevards, their situation and that of lands embraced within the park lines, were relatively so different that outside sales afforded no just grounds for determining the character of the lands taken for the park,* and hence all evidence of such sales was excluded, and you are again instructed that there is no such evidence before you.'

* * *

"We think the evidence offered was properly excluded, and that the true rule for the valuation of the property was correctly and fairly stated in the charge of the court above quoted." (Emphasis supplied.)

It should be noted that the Court held that it was proper to take into consideration the enhancement in value of the property by reason of the anticipation that the legislature would authorize the appropriation of the lands to establish the park. These lands were more or less available and their value was subject to the play

of events affecting such availability. Once the park lines were fixed the value of the lands to be taken could not by any reason be measured in any degree by the value of neighboring property after the value thereof has been influenced by the certainty of the improvement. Evidence of sales of these lands was excluded because they were no longer "similar lands" and no longer afforded any criterion for determining the character of the lands taken for the park.

Let us compare the Shoemaker and the instant cases. As we have said, the Act of August 26, 1937, reauthorized the entire Central Valley project. But there was no selection of the right of way for the railroad relocation until the complaint in this action was filed on December 14, 1938. It is true that the record shows that a survey had been made as early as 1936, but it also appears that there were more than one proposed route for the railway line. So far as the record before us shows, there was no certainty as to its location until the date of the taking.

In this circumstance, the Shoemaker case does not support the Government's contention. The Government's deductions from the facts of that case that there was no certainty as to the boundaries of the park do not logically follow. The Act did establish the location of the park, and it is apparent from the language of the Supreme Court that it based its decision on the theory that the lands falling certainly outside the park were not "similar lands" to the lands condemned.

Time of Fixing Values.

The Government's view that values of real properties which may possibly be taken by the Government are frozen at the values existing at the time of determining upon the construction of a public improvement is illogical and wholly unsupported by authority, and most certainly it is not supported by the Shoemaker case. The decisions are uniform in holding that the value at the time of the taking is the measure of compensation to which the land owner is entitled when property is taken by the Federal Government in eminent domain proceedings. United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 United States v. Rogers, 255 U.S. 163, 41 S.Ct. 281, 65 L.Ed. 566; Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; Danforth v. United States, 308 U.S. 271, 60 S.Ct. 231, 237, 84 L.Ed. 240.

In the Danforth case, supra, the petitioner alleged that the passage of the authorizing Act *diminished* immediately the value of his property because the plan contemplated the ultimate use thereof as a floodway. It was the petitioner's contention that because of this alleged fact the actual date of taking was the date of the passage of the Act. The Supreme Court held otherwise, and in the course of its decision had the following to say which is of interest in the instant case: "The mere enactment of legislation which authorizes condemnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail."

The rule contended for by the Government and which was followed by the trial judge in the instant case would lead to extremes of injustice and would be quite impracticable. Any governmental activity in connection with the improvement in any reasonable vicinity of the site of the improvement would give the Government the right to step in and condemn property at its market value as of a date immediately preceding announcement of the intended improvement, notwithstanding its legitimate rise in market value for ordinary commercial purposes. Long after commencement of the improvement the Government officials could make up their minds that an administration building should be erected upon a certain corner of a town established since the beginning of and because of the improvement. The instant owner may well have bought in the stimulated market intending to use the property for commercial purposes. Yet it could be taken from him at its value as of a time when its usefulness, if useful at all, was far inferior in character as values go.

Our holding that the owner is entitled to compensation equal to the market value of his property at the time of the taking is not inconsistent with the decisions of the Supreme Court in United States v. Chandler-Dunbar Co., supra, and Olson v. United States, supra, wherein it was stated that the property should not be valued "as enhanced by the purpose for which it was taken" [229 U.S. 53, 33 S.Ct. 677, 57 L.Ed. 1063]. What the Court meant by this expression is indicated by its language in the Olson case, 292 U.S. page 256, 54 S.Ct. page 709, 78 L.Ed. 1236: "But the value

to be ascertained does not include, and the owner is not entitled to compensation for, any element resulting subsequently to or because of the taking. Considerations that may not reasonably be held to affect market value are excluded. Value to the taker of a piece of land combined with other parcels for public use is not the measure of or a guide to the compensation to which the owner is entitled."

In other words, the owners in the instant case should receive as compensation for the lands taken the full market value of those lands as of the date of the taking. In determining that market value, evidence of sales of similar properties should be considered, whether those sales occurred before or after the passage of the Act of August 26, 1937. If upon a new trial it should develop that at any time between August 26, 1937, and the date of the taking, the location of the new railway became fixed or a "practical certainty" (United States v. Certain Lands, Town of Narragansett, C.C., 180 F. 260, 261, 262), then adjoining lands would no longer be "similar properties" and evidence of sales of such lands would furnish no criterion for the value of the property taken by the Government. This fact, however would not affect the right of the owners to prove by any other proper means the value of their properties at the date of the taking.

The decree is reversed as to the appellants, and the cause is remanded to the trial court for further proceedings consistent herewith.

GARRECHT, Circuit Judge (concurring in part and dissenting in part).

I concur with the majority opinion wherein it holds that the judgment in favor of the Government against three of the landowners for $650, being the amount deposited in court over and above the jury's award, must be vacated. Los Angeles, etc., Ry. Co. v. Rumpp, 104 Cal. 20, 25, 37 P. 859. The District Court should be affirmed on all other points. The majority opinion labors to make out that the case of Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170, relied upon by appellee, does not sustain the Government's position. To avoid the force and effect of this case the main opinion asserts that the Act there involved definitely described the lands to be taken but that in the instant case the lands to be acquired were neither fixed nor defined.

The opinion in the Shoemaker case and the statute involved, 26 Stat. 492, c. 1001, clearly shows that the lands intended to be taken were not definitely fixed other than that the selection of the site for Rock Creek Park should be made within a certain area as located therein by a commission of engineers and citizens. It is doubtful if the lands there to be taken were as definitely ascertainable as in this case.

It is not correct to say that the lands to be acquired for this Central Valley Project were unknown on August 26, 1937, when the Act was passed. Before that date the site of the Shasta Dam had been selected. Its construction involved relocation of the line of the railroad, for which surveys had been made, and as early as March, 1936, the proposed right of way was relocated and staked out on the lands here in question. Indeed, in September, 1937, a surveyor employed by appellant made a map showing the lands here involved, and thereon he platted the relocated railroad line.

In like situations courts have generally held that the landowner is not entitled to claim an enhanced value attributable to the Government Project, and the case of Kerr v. South Park Commissioners, 117 U.S. 379, 384-387, 6 S.Ct. 801, 29 L.Ed. 924, cited in the main opinion, is an authority in point. See also Orgel, Valuation Under Eminent Domain, pp. 328-352; San Diego Land, etc., Co. v. Neale, 78 Cal. 63, 75, 20 P. 372, 3 L.R.A. 83. The majority opinion distinguishes the above case and the case of Shoemaker v. United States, supra, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170, by indulging in refinements which find substance in placing undue emphasis on certain words while disregarding the purpose and effect of the decisions.

The rulings of the trial court and the instructions, repeated in various ways, held that appellant could not show or recover for any increased value of the property due to the Central Valley Project, that is, that any increase in the value of the property taken due to the Project after August 26, 1937, was to be excluded from the consideration of the jury. As the trial court remarked, "The Government must not be required to pay for something it has itself made".

In my opinion these rulings and instructions are supported by the authorities and

by sound reasoning as well. If the Government were required to compensate landowners for increase in values directly attributable to the Government Project, and which occurred after the Project has been finally authorized, a serious burden would be placed on the public.

Just compensation means the award of an amount which will be "just, not merely to the individual whose property is taken, but to the public which is to pay for it". Searl v. School-District, 133 U.S. 553, 562, 10 S.Ct. 374, 377, 33 L.Ed. 740; Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270.