**SLATTERY COMPANY, Inc., Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 15741.**

United States Court of Appeals
Fifth Circuit.

March 7, 1956.

Rehearing Denied April 24, 1956.

---

Rives, Circuit Judge, dissented.

39

John B. Hussey, Hussey & Smith, Shreveport, La., for appellant.

Elizabeth Dudley, Atty., Dept. of Justice, Washington, D. C., Perry W. Morton, Asst. Atty. Gen., Roger P. Marquis, Atty., Washington, D. C., T. Fitzhugh Wilson, U. S. Atty., and Edmund E. Woodley, Asst. U. S. Atty., Shreveport, La., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and CAMERON, Circuit Judges.

HUTCHESON, Chief Judge.

This appeal is from a judgment entered in a condemnation suit confirming the report of the commission [1] and entering judgment accordingly.

The condemnee, seeking reversal of the judgment, assigns six specifications of error.[2]

1. Appointed under the provisions of Rule 71A, Federal Rules of Civil Procedure, 28 U.S.C.A.

2. "Specification of Errors"

"(1) Where evidence of a predicted flooding is based upon a dam of a particular design and a change in the structure of the dam would increase the flooding, it is error to render judgment upon an award of compensation based upon the flooding caused by the dam of that specific design without reserving to the landowner the right to sue for additional damages if any structural changes are made in the dam which would cause additional flooding.

"(2) Where the Government expropriates the right to flood land to the 165-

Reserving for later treatment, Specifications Nos. 3 and 4, we take up each of the others in due order.

Of Specification No. 1, it is sufficient to say that we find ourselves in agreement with it in principle,[3] and that, if the judgment were affirmed, it would be modified accordingly to effect the desired clarification.

■ Of Specification No. 2, it is sufficient to say that it presents no prejudicial error because, under the evidence in this case, it deals not with a real situation arising here but with a purely hypothetical one.

■ The same thing is true of Specification No. 5, both because it does not appear that any witness in any way based his valuation on this testimony, and because, in its report, the commission, while referring to the fact that there was some testimony on behalf of the government in an apparent attempt to show

that the United States Engineers do not intend to exercise to their maximum extent all of the rights granted in the servitude, went on to state, "In fixing the value of just compensation, the commission has completely disregarded any testimony tending to show the intention of the government to exercise anything less than the full rights acquired under the servitude to the maximum extent which is possible in connection with Wallace Lake dam as constructed".

As to Specification No. 6, appellant stands no better. While asserting in brief and oral argument that Specification No. 6, complaining of the action of the commission in rejecting evidence of prices paid by the United States for the purchase in fee by private negotiation, of lands in the flowage area, was error, appellant cites only authorities supporting the general principle that consideration should be given to prices paid in voluntary sales, that is in

foot contour but, at the same time, declares that the landowner may build a home between the 158-foot and the 165-foot contours, it is error to render a judgment containing these conflicting rights without prescribing specifically whether the United States would be liable in the event a home constructed by the landowner between the 158-foot and 165-foot contours should be damaged by the United States in the exercise of its right to flood the land up to the 165-foot contour.

"(3) The proper compensation for a flooding easement is the difference between the fair market value of the land before the taking and after the taking. The Commission erred in merely assessing 'damages' for the taking and in not fixing the fair market value of the land after it was burdened with the flooding easement.

"(4) The Commission erred in merely assessing damages for the taking and in completely ignoring the after taking value of the property fixed by all expert witnesses in the case, including the Government's witnesses as well as the landowner's witnesses.

"(5) It was error to permit the introduction of parol evidence varying the terms of the written judgment of taking without an appropriate amendment to the judgment, in two particulars, (a) where the judgment of taking required

the removal and prohibited the erection of structures below the 158-foot contour line, it was error to permit testimony that the U. S. Engineer did permit the construction of derricks below that line; (b) since the judgment of taking authorized the construction of drainage

3. United States v. 2,648.31 Acres of Land, 4 Cir., 218 F.2d 518.

ditches at any place upon the land, it was error to admit testimony that the U. S. Engineer did not make any use of this right other than in cleaning and realigning the existing drainage ditches, unless the judgment of taking was appropriately amended or there was reserved to the land only the right to sue for additional damages resulting from new ditches.

"(6) The landowner tendered evidence of the price voluntarily paid by the United States for lands of comparable character at a negotiated sale in the vicinity of these lands in which no expropriation proceedings were involved and in which the United States was under no compulsion, and the evidence was excluded. It was error to deny the landowner the right to show the price voluntarily paid by the United States for such lands where there was no evidence that the sale was not voluntary and a completely arms length transaction."

dealings between persons willing and able, but not compelled, to buy or sell, it cites none applying that principle to prices paid by one having the right of eminent domain.

 Appellee, on its part, cites many cases from this circuit and elsewhere,[4] laying down the rule that "The prices paid in settlement of condemnation proceedings or the sum paid by the condemnor for similar land, even if proceedings have not been begun, is inadmissible". This rule, based upon the view that such payments are in the nature of compromise to avoid the expense and uncertainty of litigation and are not fair indications of market value, is the generally prevailing rule in this circuit and elsewhere. The only recognized exceptions to it are in cases where

the fact that parties were condemnor and condemnee either was not known or had no influence because the sale was not in connection with, or in anticipation of, condemnation proceedings.[5]

When it comes, however, to Specifications 3 and 4, which in a frontal attack upon findings and award as denying just compensation, assail the judgment as taking its property without affording due process of law,[6] we think that the matter stands quite differently and that, for the reasons hereafter stated, the judgment must be reversed.

This is a period of great governmental expansion, with enormously stepped up numbers of takings of private property for public use by expropriation, a streamlining of the procedures for taking,[7] and, because familiarity breeds

4. United States ex rel. and for Use of Tennessee Valley Authority v. Reynolds, 5 Cir., 115 F.2d 294, 296; United States ex rel. and for Use of Tennessee Valley Authority v. Bailey, 5 Cir., 115 F.2d 433, 434; United States v. 13,255.53 Acres of Land, 3 Cir., 158 F.2d 874; Murdock v. United States, 8 Cir., 160 F. 2d 358; United States v. Foster, 8 Cir., 131 F.2d 3; Orgel, Valuation Under Eminent Domain, Sec. 146, pp. 489–494.

5. 18 Am.Jur., p. 996, "Eminent Domain", Sec. 352.

6. "The exercise of the power of Eminent Domain is subject to all the prohibitions found in the Constitutions of the United States and the several states. The provisions by which the power is chiefly limited are (1) that property shall not be taken for public use without just compensation, and (2) that no person shall be deprived of his life, liberty or property without due process of law." * * "In the case of takings of property by Eminent Domain under supposed authority of congress, the due process clause of the 5th Amendment is rarely invoked since a portion of the same amendment specifically aimed at Eminent Domain forbidding taking without compensation is more directly in point. * * *"

"It is settled, however, that a taking of property which does not comply with the specific clause, that is a taking for private use or without just compensation is a deprivation of property without due

process of law. * * * The due process clause in addition to its requirement of public use and just compensation protects the land owner from the adoption of any form of procedure in Eminent Domain cases which deprives him of a reasonable opportunity to be heard and so to present such objections and claims as he is entitled to make." 18 Am.Jur., pp. 632–633, "Eminent Domain", Secs. 3 and 4.

"* * * The compensation to which the owner is entitled is the full and perfect equivalent of the property taken, and the damages inflicted by the taking,— in other words the loss caused to him. This means substantially that the owner shall be put in as good position pecuniarily as he would have been in if his property had not been taken." 18 Am. Jur., "Eminent Domain", Sec. 240, page 874, and cases cited.

7. One of these is the provision in F.R.C.P. 71A which, after providing: "The Rules of Civil Procedure for the United States District Courts govern the procedure for the condemnation of real and personal property under the power of eminent domain, except as otherwise provided in this rule", provides in Sub. (h) "Trial" for a trial by jury of the issue of just compensation, unless the court, for the reasons stated therein, appoints a commission to determine that issue, in which event it shall have the powers of a master as provided in Sub. (c) of Rule 53, its proceedings shall be governed by

contempt, a consequent growing and, therefore alarming attitude of complacency, instead of viewing with alarm, with which government and public alike look upon the exertion of the power of eminent domain by which all that a man has can be taken from him by force. Because this is so, we deem it advisable, if not necessary, before stating wherein appellant was denied due process, to first set briefly down the simple but fundamental principles which, despite their being sometimes and in some places apparently more honored in the breach than in the observance, still govern expropriation proceedings.

Completely consonant, as it is, with Madison's historic pronouncement, "In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed, and, in the next place, oblige it to control itself", perhaps the best and most moving statement of the basic principle controlling here is to be found in the opinion of the Supreme Court, in Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463, a portion of which was recently quoted as the conclusion of the opinion of the minority in United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, in support of its view that the failure of the majority to correctly apply them had resulted in depriving the property owner of the protection which this basic principle affords.

"The question presented is not whether the United States has the power to condemn and appropriate this property * * * for that is conceded, but how much it must pay as compensation therefor. Obviously this question, as all others which run along the line of the extent of the protection the individual has under the constitution against the demands of the government, is of importance, for in any society the fullness and sufficiency of the securities which surround the individual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government. The first 10 amendments to the constitution, adopted as they were soon after the adoption of the constitution, are in the nature of a bill of rights, and were adopted in order to quiet the apprehension of many that without some such declaration of rights the government would assume, and might be held to possess, the power to trespass upon those rights of persons and property which by the Declaration of Independence were affirmed to be unalienable rights.

" * * * And in this there is a natural equity which commends it to every one. It in no wise detracts from the power of the public to take whatever may be necessary for its uses; while, on the other hand, it prevents the public from loading upon one individual more than his just share of the burdens of government, and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him.

"But we need not have recourse to this natural equity, nor is it necessary to look through the constitution to the affirmations lying behind it in the Declaration of Independence, for in this fifth amendment there is stated the exact limitation on the power of the government to take private property for public uses. And with respect to consti-

paragraphs (1) and (2) of Sub. (d), "Its action and report shall be determined by a majority and its findings and report shall have the effect, and be dealt with by the court in accordance with the prac- tice, prescribed in paragraph (2) of subdivision (e) of Rule 53."

Cf. United States v. Waymire, 10 Cir., 202 F.2d 550.

tutional provisions of this nature, it was well said by Mr. Justice Bradley, speaking for the court, in Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524 [29 L.Ed. 746]: 'Illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis.'

"The language used in the fifth amendment in respect to this matter is happily chosen. The entire amendment is a series of negations, denials of right or power in the government; the last (the one in point here) being: 'Nor shall private property be taken for public use without just compensation.' The noun 'compensation,' standing by itself, carries the idea of an equivalent. * * * So that, if the adjective 'just' had been omitted, and the provision was simply that property should not be taken without compensation, the natural import of the language would be that the compensation should be the equivalent of the property. And this is made emphatic by the adjective 'just.' There can, in view of the combination of those two words, be no doubt that the compensation must be a full and perfect equivalent for the property taken * * *. This excludes the taking into account as an element in the compensation any supposed benefit that the owner may receive in common with all from the public uses to which his private property is appropriated, and leaves it to stand as a declaration that no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner." 148 U.S. at pages 324–325–326, 13 S.Ct. at page 625.

 With these declarations and admonitions kept firmly in mind, we turn to the record to test by this basic principle the claim of the appellant that the findings and award of the commissioner are clearly erroneous [8] within the meaning of the cases in that they furnish the basis for taking its property without just compensation and the due process the Fifth Amendment requires.

Appellant is the owner of a tract of land of approximately 1200 acres, situated a short distance south and in the direct path of growth of the City of Shreveport, Louisiana. Numerous suburban residential subdivisions have already been opened near the property, and it is most likely that, in the not too distant future, a large portion of it will be encompassed by the normal growth of Shreveport.

---

8. In Sanders v. Leech, 5 Cir., 158 F.2d 486, 487, we said of Rule 52(a) that the appellate court may reverse under the rule, "(1) where the findings are without substantial evidence to support them; (2) where the court misapprehended the effect of the evidence; and (3) if, though there is evidence which if credible would be substantial, the force and effect of the testimony considered as a whole convinces that the finding is so against the great preponderance of the credible testimony that it does not reflect or represent the truth and right of the case."

In United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, the Supreme Court said in effect the same thing: "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

The land has been owned by the Slattery family for more than sixty years, during which time Shreveport has grown from a small town a considerable distance away to a large city approaching this property. The land, because of its proximity to the City of Shreveport, was being held as an investment for subdivision purposes, which was its highest and best use.

On July 23, 1952, the United States filed in the District Court for the Western District of Louisiana a Declaration of Taking[9] by the Secretary of the Army, and on Aug. 14, 1952, a judgment of taking was entered expropriating a flowage easement in connection with the operation and maintenance of the Wallace Lake Reservoir dam project, which had been completed in 1946, on and over a number of tracts under separate ownership, including Tract 74, 915.40 acres of appellant's 1200 acre tract.

The lands of appellant covered by the flooding servitude were all of the lands lying below the 165-foot contour, and the United States acquired the right to "intermittently and/or permanently" flood the lands with water impounded by Wallace Lake Dam up to the 165-foot contour. The flowage easement permitted the Government to remove all timber from the property below the 150-foot contour, prohibited the land owners from constructing any buildings or improvements on the land below the 158-foot contour, and required the removal of all buildings presently situated below that contour.

The landowners presented to the commission the testimony of three expert real estate appraisers, each of whom had been engaged in the real estate business in Shreveport for thirty years, who, with a unanimity not unusual in such cases, fixed the value of the 1200 acres as a whole without the servitude at $78,735, and its value subject to the servitude at $30,281.60 with a difference of value attributable to the servitude of $48,453.40. While they came at this by dividing the 1200 acres up into tracts for purposes of valuation and by putting a valuation with and without the servitude on each tract, the effect of their testimony was to value the tract as a whole without and with the servitude.

The government's three experts, on the other hand, were interrogated, and they testified on the basis of an inspection made in 1954, *not as to the value of the property with and without the servitude*—this is greatly important because the project was completed in 1946, and though the servitude was not legally imposed until the order for taking was entered in 1952, the property had been in public estimation for six years

9. The rights expropriated were described in the Declaration of Taking and in the Judgment of Condemnation, as follows:
"The estate taken for public use is the full, complete and perpetual right, power, privilege and servitude to intermittently and/or permanently overflow or flood the lands so described with the waters impounded by Wallace Lake Dam, constructed by the United States of America; together with the further right of ingress or egress on, over and across said lands for the purpose of clearing, cutting and removing therefrom any and all brush, timber, trees and debris below elevation of 150 feet, mean sea level, together with the further right to construct and maintain drainage ditches, and to perform any and all other work necessary for the construction, operation and maintenance of such dam and reservoir for general flood control purposes. The owners, their heirs, successors, and assigns, shall have the right of occupancy and maintenance of buildings and improvements located or to be located on areas above the 158-foot contour, mean sea level. No dwelling, house or other structures shall be erected on any of the property below an elevation of 158 feet and all dwelling, houses or other structures now on said property below such elevation shall be removed within six months of the date of filing this instrument. The owners, their heirs, successors and assigns, have all such rights and privileges in and to the lands as may be used and enjoyed without interfering with or abridging the privileges, rights, easements and servitudes as set forth."

subject to the actual, though not the legal, burden of the dam—but with reference to the value *before and after the filing of the declaration of taking.* Two of them, with the same not surprising unanimity that had attended the views of the condemnee's witnesses, agreed on a value, just before of $36,000 and $38,000, and after the taking of $30,000 and $32,000. One of them, Mr. Buvens, however, confronted with the stock question, Did you arrive at and did you fix the fair market value in a transaction between a willing seller and a willing buyer at the moment prior to the declaration of taking, which was in August, 1952?, answered, "I did. I fixed the value at $50,000"; and when asked the next question, Did you arrive at a value of the property as of the moment after the taking, the lapse of one second, answered, "Yes, I get the same value of $50,000 before and after the declaration of taking." "You mean the property is not hurt?" "Physically, I don't believe so. But I did give damages of $5000."

This answer to the question was a wise and proper one because, without full and careful instruction, it was inevitable that the witness would conclude that, for the purpose of the question, the property was already damaged by the presence of the dam, and that it could not have been damaged in any substantial amount more just after the declaration of taking than before because as regards damaging effects it had already been taken.

The same witness further testified:

"Q. Mr. Buvens, do you think the property would sell for as much immediately following the easement

as it would sell immediately before? A. I do. I base my opinion on this: Because I find a lot of other properties have sold for just as much if not more than what they did before the easement. I don't *mean to say they sold for more on account of the easement, but it was the general conditions.* I have sold different property down there. *I had to be very careful to explain to these people about this easement. It was on record and I made sure it was in the deed. After I explained it the way I saw it, there wasn't any sales resistance getting them to buy the property on account of the easement."* (Emphasis supplied.)

While it is quite probable that the other witnesses for the government were laboring under the same misapprehension that, though the threat and menace of the servitude had been present for many years, the instant before and the instant after the filing of the declaration of taking in 1952 were the only matters to be taken into consideration, this is not quite as clear in their testimony as in the testimony of Buvens, though their chief witness, May, said that the influence of the dam on values [10] had been felt for many years prior thereto. Cf. Pappenheim v. Metropolitan Elev. Ry. Co., 128 N.Y. 436, 28 N.E. 518, 13 L.R.A. 401, at pages 405–406, 26 Am.St.Rep. 486.

As further evidence of the failure, of the proof on the part of the government and of the award of the commission, to conform to the standard of market value required, attention is particularly called to this testimony of their chief witness:

10. This witness, after stating that he tried to arrive at a value of the property from three separate approaches, one, cost less depreciation, another capitalizing property and trying to estimate the return which the owner received, and that neither of these could be used, stated in substance as his sole basis for valuation, that it was necessary for him to fall back upon the method of comparison of prices which he thought the property should bring as compared to sales which had previously taken place. He then, beginning with one transaction as far back as 1938, a sale of his own land, coming down through 1947 and on to 1952, stated with reference to all of them except the sale to him in 1938, "All of those sales were made subject to the flowage rights".

"I think in arriving at this damage, it is purely a matter of judgment. *You are actually not taking anything away from the man. He has it yet and it has every value it ever had before and, therefore, it would be an arbitrary figure to try to state that property was damaged ten or twenty percent."* (Emphasis supplied.)

Cf. 18 Am.Jur., "Eminent Domain", Sec. 356, p. 1001, where it is said:

"Opinion Evidence as to Damage. —In determining the damage to land not taken, a witness must be familiar with the market value before the injury was inflicted and the market value afterward, and estimates of percentage of value lost, not based upon some substantial ground, should be excluded. * * * In some jurisdictions it is held that a witness should not be allowed to state the amount of damage, but should limit himself to the value before and the value after the injury. * * *"

and Cumulative Supplement thereto, page 131, citing People v. McReynolds, 31 Cal.App.2d 219, 87 P.2d 734.

In another way, the presence of the dam in contemplation for many, and completed more than six years before 1952, had the effect, if not cleared up by appropriate questions and explanations, of clouding the whole proceeding and everybody's view about it, not only with reference to the evidence given as to purchases which were offered for purposes of comparison, which prices were necessarily influenced by the fact of the dam and its flowage, but also in the minds of the commission in trying to straighten the problem out.

Finally, perhaps the strongest evidence of the whole state of confusion, created by the existence and operation of the dam for some time before the declaration of taking was filed, is the amount of damages awarded by the commission. This appears in the fact that, while the commission apparently fixed the market value of the property before the declaration of taking at $60,000, it fixed the damage award at an amount which, if regarded as based upon the valuation of the property after the declaration of taking, was a value greatly in excess of the value fixed by three witnesses for condemnee and two witnesses for the government, and considerably above the price fixed by the lone witness for the government who, testifying not as to the value with and without the servitude but before and after the declaration, said that the property was actually worth as much after the filing of the declaration of taking as it was before.

█ With these basic considerations and facts in mind, we turn to appellant's specific complaints against the findings and award. These are in substance that: contrary to the settled law pertaining to such awards that the standard and measure of value in condemnation proceedings, where the estate taken is less than the fee or absolute ownership, as a flowage easement or servitude, and of the compensation to be paid for the rights appropriated is the difference between the fair market value of the land as a whole, with and without the burden,[11] and "that a

---

11. Karlson v. United States, 8 Cir., 82 F. 2d 330, 332; Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; United States v. Certain Parcels of Land, 5 Cir., 149 F.2d 81.

"Market Value as Measure of Damages.—When a parcel of land is taken by eminent domain, the measure of compensation to be awarded the owner is the price which would be agreed upon at a voluntary sale between an owner willing to sell and a purchaser willing to buy; in other words the test is the fair market value of the land. * * *" 18 Am.Jur. "Eminent Domain", Sec. 242, pp. 875-6.

"Actual market value at the time of the institution of the condemnation proceedings is usually the inquiry. But when the defendant has already entered upon the property, and has depreciated its value thereby, it is plain that the simple question of value at the time of condemnation is not the proper rule. In

parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for the taking of part or all of it." United States v. Miller, 317 U.S. at page 376, 63 S.Ct. at page 281; the commission has determined the value of the property without the burden and then deducted from it amounts arbitrarily arrived at by trying to state that the property was damaged ten, twenty, or some other arbitrary percent.

▮ We think it clear: that the commission, instead of determining just compensation under the settled rule of law as the difference between the value of the land as a whole with and without the servitude, determined it by its unguided, unregulated, and, therefore, arbitrary opinion of the proper amount of damage to allow to theoretically separate parcels, and thus deprived the condemnee of the fundamental safeguards which the law has set up for its protection; and that its findings and award have operated to take appellant's property without due process of law.

It is true that the witnesses for the condemnee testified that they had divided the land into separate tracts for the purpose of arriving at a proper valuation of it as a whole with and without the servitude, and that the commission, though not the government witnesses, used the same division. In their final testimony, however, condemnee's witnesses gave a total value of the whole with and without the servitude, while the commission did not do so. It is true, also, that the commission does state in its award, "In fixing our values we have throughout kept in mind the fact that we are dealing with a 1200 acre tract of land. However, in order that this opinion may conform to the testimony, we will discuss our findings by reference to the above method of subdivision."

When, however, they came to make up their findings, they did not follow the rule they had laid down for themselves, for though they found the fair market value for each of the separate tracts just prior to the declaration of taking, they made no finding as to fair market value of the property with the servitude. Indeed, they undertoook to determine the just compensation due as the equivalent of what was taken by a process not made clear, except as the commission states it on pages 464–5 of the record.[12] Saying, "The deter-

such case the inquiry must be, What would be the fair market value of the whole property at the time of condemnation, without the railroad? and the difference between that sum and the present market value of the property left, with the railroad in existence, would constitute the measure of damages to which the owner would be entitled." Pappenheim v. Metropolitan Elev. Ry. Co., 13 L.R.A. at pages 405–406, cited and quoted from in 18 Am.Jur., "Eminent Domain" Sec. 242 at pp. 877–8. Cf. 23 Tracts of Land, etc. v. United States, 6 Cir., 177 F.2d 967, at page 970, and Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142. Danforth v. United States, 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 is not at all to the contrary. Cf. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336.

"Value for Prospective or Available Uses by Owner.—The tribunal whose duty it is to determine the value of land taken by eminent domain is not limited to the value of the land for the purposes for which it is actually used, but may consider all uses to which it is adapted and might be put, and will award compensation upon the basis of its most advantageous and valuable use, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future." citing Portland & R. R. Co. v. Deering, 78 Me. 61, 2 A. 670, 57 Am. Rep. 784, to the effect that "A distinction is to be observed between what land may be worth in the future and what it is now worth in view of the future. 18 Am.Jur., "Eminent Domain", Sec. 244, pp. 879–880.

12. "The determination of the amount of impairment of value which resulted from the imposition of the servitude is extremely difficult. All of the experts agree that the damages should be fixed as the amount by which the value would be lessened to a willing purchaser by vir-

48

mination of the amount of impairment of value which resulted from the imposition of the servitude is extremely difficult", it proceeded to determine, not the value of the property as a whole with and without the servitude, but, using the method which May, the government's chief witness, correctly condemns as arbitrary, it declared: "We believe the percentage of damage to tracts one and two is twenty percent, and the amount of just compensation for the rights taken to be $8000"; as to tract, 3, "the damage to the land amounts to ten percent, or $480"; as to tracts 4 and 5, "We have arrived at a before taking value of $15,300 and a total value of the damage to this land of $765."; and *based upon the above conclusions, we submit our findings of the amount of just compensation owed to the landowners as $9,235.*" (Emphasis supplied.)

Thus, though the commission had stated that it had kept in mind that the property must be valued as a whole and it did this as to the fair market value of the sum of all the parts, free of the servitude, it did not make findings of value subject to the servitude, but merely of its opinion as to how much it should arbitrarily deduct for damage here and damage there.

 The effect of this, in addition to being without support in the principles of valuation for condemnation, was to deprive appellant of just compensation for all the tracts below the higher contour lines by treating these tracts as though they were small isolated useless pieces of land, unconnected with and not a part of a larger tract, the value of which with and without the servitude they were entitled to have fixed as a basis for the award of

compensation to which they were entitled. In addition, however, to the use of wrong procedures in arriving at their findings, the findings on their face are clearly erroneous. This is so because, valuing the separate tracts in the aggregate at $60,000 without the servitude, as the commission did, and then arbitrarily deducting about fifteen percent from this value for what the commission called damages, if indeed its award could be considered as really a finding of $60,000 without and $50,000 with the servitude, this finding would be unreasonable on its face when it is considered that all the witnesses but one fixed its burdened value at from $30,000 to $32,000, and that one fixed its value at $50,000 both before and after the declaration of taking.

 Finally, if on another trial evidence is offered as to what might reasonably be expected in the way of actual, as opposed to theoretical, overflowage from the dam, the judgment of condemnation should be so framed, as to conform it to the findings and the evidence on which they are based, and thus protect the condemnee from, having its award based upon a servitude which the evidence showed to be less than the judgment of taking conferred upon the taker, and finding itself in the position in which it now stands under the judgment appealed from.

The judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

RIVES, Circuit Judge (dissenting).

I respectfully dissent. As to Specification of Error No. 1, the easement to overflow or flood the lands is limited by the judgment as follows: "with the waters impounded by Wallace Lake Dam

tue of the imposition of the servitude. The only appraisal method which is of any assistance is the use of sales of comparable land, before and after the servitude. Unfortunately, because of the small number and points of difference of such sales, this method gives only a general guide to the Commission. Inso-

far as actual damage is concerned, the servitude does not apply above the 165 feet elevation and the amount of severance damage to the property above that elevation would be based entirely upon the damage to the remainder of the tract."

constructed by the United States of America." Wallace Lake Dam had been completed before the judgment was entered. Its spillway had a height of 158 feet; the overall height of the dam was 165 feet; there were four sluices three feet wide by eight feet high at an elevation of 142 feet, designed to be and remain permanently open, without means of being closed and not capable of being closed accidentally by debris or otherwise. Thus the dam would create a permanent pool up to 142 feet only, the water would go over the spillway at 158 feet and over the dam at 165 feet. It seems to me clear enough that the easement is based upon the flooding caused by the particular dam as so constructed and that the landowner would, without more, have the right to additional compensation if any structural changes should ever be made in the dam which would cause additional flooding. So thinking, I cannot join my brothers in agreeing in principle with Specification No. 1.

The only lands that would ever be flooded permanently by waters impounded by Wallace Lake Dam are those below the 142 foot contour, and the undisputed evidence shows that little, if any, of these lands are below that contour. The majority finds with the Government as to Specifications 2, 5 and 6, and I agree.

The majority states as a fact that, "The land, because of its proximity to the City of Shreveport, was being held as an investment for subdivision purposes, which was its highest and best use." That statement seems to me not in accord with the findings of the Commission [1] amply supported by the testimony.

The measure of compensation is the difference in values before and after taking. The Commission found the value of the property before the taking and then determined "damages" by depreciating the value of the property after the imposition of the easement. To me that seems a departure in form rather than in substance from the prescribed formula. Cf. 18 Am.Jur., Eminent Domain, § 356.

Subtracting the "damages" from the Commission found value of the property before taking, there is produced an after taking value of the land larger than that fixed by any of the witnesses. However, the difference between the value before taking and such after taking value was within the limits testified to by the witnesses, that is, it was more than such difference according to the testimony of the Government's witnesses and less than the difference according to the landowner's witnesses. It was within the province of the Commission, I think, to accept and act on

---

1. For example, the Commission considered the property as divided into five tracts, partially described as follows:

"The property which makes up Tracts 1 and 2 consists of two rather distinct types of land.

"Approximately 175 acres are comparatively high and well drained and lie along a ridge running north and south for the length of the tract. * * *

"The remainder of the property in Tracts 1 and 2, being some 225 acres, consists of considerably lower, flat and rather poorly drained lands. This portion of the land is traversed by Brushy Bayou and is subject to frequent overflows from headwater. Unlike the high lands, which appear well suited for subdivision purposes, it is doubtful that the lower property by itself could ever be economically subdivided due to the necessity of expensive and extensive drainage work. * * *

"Tract 3 consists of some thirty-five acres of high land, about forty-five acres of land similar to the lower portions of Tracts 1 and 2 and of some forty acres of extremely low, swampy, poor quality land of very little value. * * *

"Tracts 4 and 5 contain approximately one hundred ten acres of high land, about one hundred acres of intermediate land which is suitable for cultivation and pasturage and the remainder is very low, swampy land of the type described under Tract 3. The high land in these tracts, unlike that in Tracts 1 and 2, is not so situated as to be readily suited for subdivision in connection with the remainder of the Slattery property. * * *"

all or any part of the testimony of any witness and to draw all reasonable inferences therefrom. I cannot agree that the findings, either on their face, or in fact, are clearly erroneous. To the contrary, I think that they are amply supported by the evidence.

Finally, it seems to me that the time of taking was in August, 1952, at the time of the filing of the declaration of taking and accompanying deposit of estimated compensation. True, the construction of the dam had been authorized in 1938, and it had been completed in 1946, but none of these lands were within the bed of Wallace Lake or were permanently flooded, and there was no evidence that before the declaration of taking any of the lands had in fact been flooded by waters impounded by the dam, though that fact does not seem to me material. The servitude, according to my understanding, was not imposed prior to the declaration of taking. Any reduction in value which may have occurred by reason of the legislation or the beginning or completion of the project prior to the declaration of taking cannot be recovered in these proceedings. Danforth v. United States, 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240.[2] Indeed, that would be true even if any damage had theretofore been caused by actual flooding with the impounded waters. "The property taken was the right to use in the future. The commissioners were not authorized to make any award on account of damages caused by unlawful flooding of shorelands prior to the taking." Olson v. United States, 292 U.S. 246, 262, 54 S.Ct. 704, 711, 78 L.Ed. 1236.

A reading and study of this record convinces me that the case was carefully tried by a district judge thoroughly familiar with the applicable principles of law and with the aid of a conscientious and thorough Commission, and that the result reached was right and just. I, therefore, respectfully dissent.

On Petition for Rehearing.

PER CURIAM.

Leave to file brief amicus curiae is granted. Motion for rehearing is hereby denied.

RIVES, Circuit Judge, dissenting.

---

2. In that case it was said, "A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense."

See the many cases collected in the full and illuminating discussion in 2 Nichols on Eminent Domain, 3rd ed., § 6.38, p. 285 et seq., and § 6.4432(1), p. 339 et seq. See, also, United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 76, 33 S.Ct. 667, 57 L.Ed. 1063; Miller v. United States, 9 Cir., 125 F.2d 75, 80; Murray v. United States, 76 U.S.App.D.C. 179, 130 F.2d 442, 444; 23 Tracts of Land v. United States, 6 Cir., 177 F.2d 967, 970.