Gloria C. Pinczkowski and Leroy S. Pinczkowski,
Plaintiffs-Appellants,†

v.

Milwaukee County, Defendant-Respondent.
[Case No. 03-1732.]

Gloria C. Pinczkowski, Plaintiff-Appellant,†

v.

Milwaukee County, Defendant-Respondent.
[Case No. 03-2127.]

Court of Appeals

*Nos. 03–1732, 03–2127. Oral argument June 8, 2004.—Decided
August 31, 2004.*

2004 WI App 171

(Also reported in 687 N.W.2d 791.)

---

† Petition to review granted 1-11-2005.

520

521

522

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Alan Marcuvitz* and *Andrea H. Roschke* of *Michael, Best & Friedrich LLP*, of Milwaukee, with oral argument by *Alan Marcuvitz* and *Andrea H. Roschke*.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Timothy R. Karaskiewicz,*

office of the corporation counsel, Milwaukee, with oral argument by *Timothy R. Karaskiewicz*.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. CURLEY, J. Gloria Pinczkowski appeals the judgments of the trial court that determined: (1) the sale prices of adjacent properties sold to Milwaukee County were inadmissible at trial; (2) the letter of intent to purchase the Pinczkowski property from the Hertz Corporation was also inadmissible; and (3) Pinczkowski was not entitled to any housing replacement payment. Because clear precedent prohibits the introduction of the sale price of comparable properties when sold to a condemning authority engaged in negotiations to obtain property for a public project; a letter of intent submitted by a prospective buyer is not proper evidence of the condemnation property's fair market value; and, under the formula found in Wis. Stat. § 32.19(4)(a) (2001–02),[2] Pinczkowski was ineligible for any replacement housing payment, we affirm.

### I. BACKGROUND.

¶ 2. In 1987, Milwaukee County began planning to expand General Mitchell International Airport. These plans were detailed in an Airport Master Plan that was passed by the Milwaukee County Board of Supervisors in 1993 and included obtaining properties located near the airport for airport use. One such property was owned by Gloria Pinczkowski.[3] The Pinczkowski property consisted of a large lot and a resi-

---

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[3] Although many of the moving papers, including the notices of appeal, refer to Gloria Pinczkowski's husband, Leroy

dence located on that lot. The area in which the Pinczkowski property was located had been zoned industrial, thus making their residential use a nonconforming use.

¶ 3. Soon after the completion of the Master Plan, the Milwaukee County Board of Supervisors approved the acquisition of the Pinczkowski property, along with the properties adjacent to that of Pinczkowski's, by either negotiated sale or condemnation. As a result, in 1997 and 1998, respectively, the County purchased the properties located to the north and south of Pinczkowski's after negotiating with the owners.[4]

¶ 4. In connection with the airport expansion project, private businesses, such as the Hertz Corporation, were also asked to vacate their leaseholds and relocate to alternative sites. Consequently, in 1997, Hertz contacted Pinczkowski and sent a letter of intent expressing an interest in purchasing the property. However, Hertz subsequently abandoned its attempt to purchase the Pinczkowski property.[5]

---

Pinczkowski, after trial it was discovered that Leroy Pinczkowski was not on the deed, as Gloria Pinczkowski inherited the property, and he was dismissed from the judgment entered against Gloria.

[4] Both properties were acquired for the airport expansion plan. Federal noise abatement funds were used for the purchase of one of the properties.

[5] The reason why Hertz abandoned its attempt to purchase the Pinczkowski property is unclear. Pinczkowski argues that Hertz's assemblage plan was disrupted when the County purchased the adjacent properties. The County claims that Hertz stopped its pursuit after it realized that the County had plans to acquire the Pinczkowski property. In any event, representatives of Hertz were never deposed.

¶ 5. In 1999, the County offered to purchase the Pinczkowski property for $93,027. Because the Pinczkowski lot was larger than average in size, and because the property had a "higher and better use" if used for airport purposes, the County was required by WIS. ADMIN. CODE § COMM 202.68(7)(a)2 and (7)(c), respectively, to separate the amount attributable to the residence from the total amount—a calculation also referred to as the "carve-out" value. The County determined that the "carve-out" value of the residence was $53,748, or 57.8% of the total amount offered, and the remainder was thus attributed to the surrounding land. The County also determined that the reasonable cost of a replacement residence would be $77,926. Pursuant to WIS. STAT. § 32.19(4)(a)1, the County subtracted the carve-out value from the cost of a replacement residence, yielding $24,178. According to the letter sent to Pinczkowski, a housing replacement payment was available to her, as long as she purchased a replacement home that cost at least $77,926.[6] Pinczkowski, however, rejected the County's $93,027 offer and later purchased a new residence for $155,000.

¶ 6. Through an "Award of Damages," Milwaukee County acquired the Pinczkowski property by eminent domain, on November 10, 2000. The County paid Pinczkowski a total of $350,000 in compensation, which was the calculated fair market value of the property. Dissatisfied with this award, Pinczkowski challenged it and, as a result, pursuant to WIS. STAT. § 32.06(10), a condemnation trial was held in March 2003.

---

[6] According to WIS. STAT. § 32.19(4)(a)1, in addition to the fair market value, a condemnor shall pay a displaced homeowner a housing replacement payment that is not to exceed $25,000.

¶ 7. At trial, Pinczkowski sought to introduce evidence to show that the fair market value of her property was higher than the County's calculation. To this end, Pinczkowski wanted to introduce evidence of the 1997 and 1998 purchase prices of the two adjacent properties, claiming that they were made voluntarily and, consequently, that these sales were an indication of the value of her property.[7] Similarly, Pinczkowski also sought to introduce the Hertz letter, asserting that the letter showed that Hertz was willing to purchase her property for far more money than was offered by the County, had it also been able to acquire the additional properties previously purchased by the County. Hence, Pinczkowski sought to argue that the County ruined Hertz's "assemblage" plan and thereby reduced the value of her property.

¶ 8. In response to Pinczkowski's attempt to introduce the aforementioned evidence, the County filed a motion *in limine* to exclude the evidence, arguing that evidence of sales to a condemning authority as part of a condemnation project, and unaccepted offers to purchase such as Hertz's, are not admissible as evidence of value. The trial court granted the County's motion, thus barring Pinczkowski from introducing evidence of the sales of the adjacent properties and the Hertz letter. The trial court emphasized that it excluded evidence of the two sales because "the properties were purchased as part of Milwaukee County's airport expansion project and . . . were not arms-length transactions as they were made by a condemning authority with the right to eminent domain." The trial court also specifically stated

---

[7] Neither property was a residence. One was an auto parts store and the other went by the name "Veterans Park," although structures existed on the property.

that the Hertz letter could not be used to establish value and that Pinczkowski's appraisers could not use it in arriving at an estimated fair market value for the Pinczkowski property. The jury, nonetheless, heard evidence indicating that Hertz had contacted Pinczkowski and that Hertz ended up purchasing a different property near the airport to which it subsequently moved its operation.

¶ 9. At the conclusion of the trial, the jury determined the fair market value of Pinczkowski's property was $300,000, reducing Pinczkowski's award by $50,000. Another $15,000 was deducted due to environmental factors, resulting in a final award of $285,000.

¶ 10. In addition to challenging the compensation they received, Pinczkowski also brought another action concerning the housing replacement payment. The cases were subsequently consolidated. After the County paid Pinczkowski $350,000 for the property, Pinczkowski sought to collect the $24,178 housing replacement payment mentioned in the earlier notice sent by the County. The County refused to pay Pinczkowski this amount, arguing that she was not entitled to any payment because the total amount she had already been paid was greater than the cost of the replacement residence. The County contended that the $24,178 replacement payment would have been applicable only if Pinczkowski had accepted the County's initial offer of $93,027. After the jury trial, the trial court granted the County's motion for summary judgment in regard to this issue.

¶ 11. Pinczkowski now appeals the trial court's exclusion of the evidence of the two adjacent properties' sales, as well as the Hertz letter. Pinczkowski also appeals the trial court's grant of summary judgment with respect to the housing replacement payment.

## II. ANALYSIS.

A. *The trial court properly excluded evidence of the sale prices of adjacent properties.*

¶ 12. Pinczkowski first argues that the trial court erred when, in response to the County's motion *in limine,* it barred Pinczkowski from introducing any evidence of the 1997 and 1998 sales of the adjacent properties as comparables to her property for use in their appraisers' calculations of fair market value. She claims this error requires a new trial.

¶ 13. Rulings on the admission of evidence "touching upon the value of property appropriated in condemnation cases" are largely a matter of the trial court's discretion. *Calaway v. Brown County,* 202 Wis. 2d 736, 741, 553 N.W.2d 809 (Ct. App. 1996). In order for a discretionary act to withstand scrutiny, the appellate court must find "that the trial court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982). If the trial court bases its exercise of discretion upon an error of law, that constitutes a misuse of discretion. *State v. Hutnik,* 39 Wis. 2d 754, 763, 159 N.W.2d 733 (1968).

¶ 14. Pinczkowski argues that, contrary to the trial court's findings, the sales of the adjacent properties were voluntary, arms-length transactions. She points out that the circumstances surrounding the sales had all the indicia of arms-length transactions—the County used standard real estate purchase contracts when purchasing the properties; the deeds did not

530

contain the standard language found when acquired under threat of condemnation; there were no certificates of compensation following the closings, a statutory requirement for a negotiated purchase under condemnation pressure; and the sellers paid transfer taxes, which would be unnecessary if the properties had been taken by condemnation. Indeed, Pinczkowski indicates that the County's own expert described the sales as "voluntary."

¶ 15. Additionally, while acknowledging that Wisconsin case law prohibits the introduction of evidence of the amounts paid for land purchased in settlement or contemplation of condemnation, Pinczkowski attempts to distinguish these cases. Pinczkowski claims the sales were "voluntary sales of the immediately adjacent properties years before the acquisition of the property and not made under threat of condemnation or as part of an on-going project," and thus she contends the properties' sale prices should have been admissible as evidence of market value. Finally, Pinczkowski cites foreign law for the proposition that the sale prices were admissible. We are unpersuaded by all of Pinczkowski's arguments.

¶ 16. First, we pause to examine Pinczkowski's characterization that these sales were not part of an ongoing project. We observe that, in the Airport Master Plan, compiled in April 1992, and, as noted, approved by the County Board on September 23, 1993, one of the adjacent properties, the sale price of which Pinczkowski was attempting to introduce, was listed in the appendix under the title "Properties to be Acquired–C1 Concept." Thus, it was public knowledge as early as April 1992 that the County intended to purchase the adjacent property for airport expansion. Moreover, a County inter-office memo dated August 29, 1996, entitled "Airport Parking Expansion Alternatives," sent to the then-

County Board Chairperson, states the following with respect to the three properties:

> 5607 S. Sixth Street, Curtis Minten and Joan Otzelberger owners, also known as Veteran's Park, may be acquired under the HOPP Program and is currently in the appraisal stage. The owners have not firmly decided whether to sell the property.
>
> 5617 S. Sixth Street, Larry S. Pinczkowski owner, is eligible for acquisition under the Homeowners' Protection Program (HOPP) and is being appraised. The owner has not firmly decided whether to sell the property.
>
> 5675 S. Sixth Street, Lake Auto Parts, Kenneth Zeck, owner. Mr. Zeck is interested in selling the property. This parcel is not part of the HOPP noise acquisition program.
>
> . . . .
>
> Furthermore, the properties recommended for acquisition are programmed in the Master Plan for future cargo development. Consequently, the acquisition of these parcels is recommended as it would serve two purposes, auto parking and then cargo, and would, therefore, continue to be productive should a second parking structure be built.

Thus, the County's intentions to acquire these properties were well known in 1996. These facts defeat Pinczkowski's claim that the adjacent properties were not acquired "as a part of an on-going project."

¶ 17. Further, we note that the condemnation procedure set forth in Wis. Stat. § 32.05(2a) requires the condemning authority to first attempt to negotiate a purchase of the property. Thus, it would be expected that in furtherance of a large expansion project, such as

what occurred here, some property owners, like those owning the adjacent properties, knowing that their properties eventually would be condemned, "voluntarily" agreed to a sale after they were approached by the County. Thus, the sales of the two properties adjacent to the Pinczkowski property can hardly be characterized as "not made under threat of condemnation."

¶ 18. With regard to the admissibility of the sale prices, evidence as to the price paid for property sold voluntarily to a condemning authority is generally inadmissible:

> In a majority of the cases in which the question has arisen, courts have held that evidence as to the price paid by the same or another condemning agency for other real property which, although subject to condemnation, was sold by the owner without the intervention of eminent domain proceedings, is rendered inadmissible to prove the value of the real property involved merely because the property was sold to a prospective condemnor.

J.H. Cooper, Annotation, *Admissibility on Issue of Value of Real Property of Evidence of Sale Price of Other Real Property*, 85 A.L.R.2d 110, § 10 (2004) (footnote omitted).

¶ 19. The obvious and well-founded reasons behind the rule are articulated in *Kirkpatrick v. State*, 53 Wis. 2d 522, 192 N.W.2d 856 (1972):

> The problem with evidence of sales of other land to the condemning authority is that the price may very well not be the fair market value of land, no matter how comparable the land may be in its physical aspects. This is so merely because the price is not determined by an arms-length transaction, but rather by dealings between one who must buy and another who has no choice but to sell.

. . . .

"... The rights of an owner to recover just compensation for the taking of his land are not to be measured by the generosity, necessity, estimated advantage, or fear or dislike of litigation which may have induced others to part with the title to their real estate, or to relinquish claims for damages by reason of injuries thereto. It would be equally unwise, unjust and impolitic to make it impossible for a condemnor which has taken land by eminent domain to compromise the claims of one owner without furnishing evidence against itself in all similar claims. If a sale is made to a condemnor that is about to institute proceedings if it cannot acquire the land by purchase at a satisfactory price, the amount paid is not a fair test of market value . . . ."

*Id.* at 526 (citation omitted).

¶ 20. *Herro v. Department of Natural Resources*, 67 Wis. 2d 407, 227 N.W.2d 456 (1975), is the most recent Wisconsin case examining whether the sale price of a surrounding property voluntarily sold to the condemnation authority is admissible in determining the fair market value of a property taken by formal condemnation proceedings. In *Herro*, the supreme court upheld the long-standing Wisconsin rule that the sale price is inadmissible:

The rule in Wisconsin on this issue is settled and does not support the appellant's position. In *Blick v. Ozaukee County* (1923), 180 Wis. 45, 46, 192 N.W. 380, this court stated:

"... The great weight of authority, however, is to the effect that the price paid in settlement of condemnation proceedings, or the price paid by the condemnor for similar land, *even if proceedings had not been begun,*

where the purchaser has the power to take by eminent domain, is not admissible . . . ."

*Id.* at 432–33 (emphasis in original). Given the long-standing and well-established precedent, we see no need to look to foreign law as the facts here fall squarely within the rule and do not permit a different result. The sales of the adjacent properties were accomplished as part of the airport expansion and the sellers were well aware of the County's intentions to eventually acquire their land for this purpose.

¶ 21. Thus, we agree and adopt the trial court's conclusion that the purchases of the adjacent properties were inadmissible:

> The Court finds that the purchases by Milwaukee County were not arms-length transactions. Although Plaintiffs argue (and Defendant concedes) that the purchases were "voluntary" transactions, the Court disagrees. Milwaukee County, as an authority in general and specifically, a condemning authority, approached the owners of the property to purchase their land. The Court questions whether the owners of the other property were actually unaware of the airport expansion project and the fact that Milwaukee County was purchasing their property for that project. That awareness alone and the general awareness of the public regarding the expansion project may preclude the sale of the property to other buyers. An owner in that situation may certainly have felt compelled to accept an offer from the County on the assumption that: (1) they would get no other offers because the public is aware that the expansion is to take place; and (2) that the County would eventually take their property if they did not sell it to them. This is exactly the evidence that was meant to be precluded, as it is not indicative of fair market value of the property. Even

535

without the knowledge that their property was being acquired for the expansion, the Court finds the evidence of those sales inadmissible as they were in fact made in furtherance of the expansion project and as such were part of a negotiation process that would have culminated in condemnation if the owners had not decided to sell. For all practical purposes, that property was taken under threat of condemnation as the County had the power to take the property by eminent domain. As such, the Court finds that the purchases by Milwaukee County of land adjacent to Plaintiffs' property for the airport expansion project were not arms[-]length transactions.

## B. *The trial court correctly excluded evidence of the Hertz letter.*

¶ 22. Pinczkowski insists that the trial court erroneously excluded the Hertz letter on the ground that it may not be used to prove fair market value and contends that the trial court should have allowed the existence of the letter into evidence, excluding the amount stated. She maintains that barring the evidence affected her substantial rights and requires a new trial.

¶ 23. First, Pinczkowski contends that she wanted to introduce the Hertz letter, not as a representation of fair market value, but rather to show that there was a private market for the property. Specifically, she claims that even though it was undisputed that the "highest and best use" of the property was airport related, the excluded evidence was relevant to show that Hertz had plans to purchase both the Pinczkowski property and the adjacent properties. She thus argues that barring the evidence prevented discussion of "possible private party assemblage," and that the evidence would have shown that when the County purchased the adjacent properties, it ruined Hertz's assemblage plan.

Consequently, Pinczkowski argues that by ruining Hertz's plan, the County reduced the probable fair market value of the Pinczkowski property, which they contend was an unjust means for a government entity to reduce a condemnee's compensation.

¶ 24. Second, Pinczkowski argues that, because Hertz expressed an interest in the Pinczkowski property but later purchased a different property, the Hertz letter would also have "validated Pinczkowski's experts' approach to choice of comparables." She argues that the letter shows why Pinczkowski's appraisers, unlike the County's appraisers, relied on Hertz's eventual purchase of another property as a comparable sale in estimating the Pinczkowski property's value. She hence asserts that since Hertz showed an interest in two properties and ultimately purchased one of them, there is an indication that the two properties were comparable. Pinczkowski argues, therefore, that the Hertz letter would have made Pinczkowski's appraisers' estimates, which were higher than those of the County's experts, more credible, because it would have explained why the appraisers relied on Hertz's eventual purchase of the other property. Accordingly, Pinczkowski argues that allowing the Hertz letter into evidence would have resulted in a higher jury verdict.

¶ 25. "A [trial] court has broad discretion in determining the relevance and admissibility of proffered evidence." *State v. Oberlander*, 149 Wis. 2d 132, 140, 438 N.W.2d 580 (1989) (citation omitted). We review the trial court's decision to exclude this evidence under the erroneous exercise of discretion standard. *State v. Walters*, 2004 WI 18, ¶ 13, 269 Wis. 2d 142, 675 N.W.2d 778. "An appellate court will uphold an evidentiary ruling if it concludes that the [trial] court examined the

relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach." *Id.*, ¶ 14. Therefore, this court will not find an erroneous exercise of discretion if a reasonable basis for the trial court's determination exists. *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983).

¶ 26. A new trial shall not be granted unless the trial court made an erroneous ruling and the ruling affected the substantial rights of the parties. *Martindale v. Ripp*, 2001 WI 113, ¶ 31, 246 Wis. 2d 67, 629 N.W.2d 698. The substantial rights of the parties are affected only if there is a reasonable possibility that the error contributed to the outcome of the case. *Id.*, ¶ 32.

¶ 27. The general rule in Wisconsin is that unaccepted offers are impermissible as proof of fair market value in condemnation cases. *Fox Wis. Theatres, Inc. v. City of Waukesha*, 253 Wis. 452, 456–57, 34 N.W.2d 783 (1948). However, in certain situations, fair market value may be proved using offers to purchase, but only when they are "made with actual intent and pursuant to actual effort to purchase." *Id.* at 456 (quoted source omitted). Therefore, our supreme court has stated that, "[i]n order to qualify as probative evidence, there must be a preliminary foundation of 'the *bona fides* of the offer, the financial responsibility of the offeror, and his qualifications to know the value of the property.'" *Bihlmire v. Hahn*, 31 Wis. 2d 537, 544–45, 143 N.W.2d 433 (1966) (quoting *Fox Wis. Theatres*, 253 Wis. at 458).

¶ 28. The trial court held that the Hertz letter was nothing more than a conditional letter of intent, and that any claim that the letter amounted to an actual offer is purely speculative. The trial court also

concluded that even if Hertz did have the financial resources to complete the transaction, as well as the ability to know the proper value of the property, any possible transaction would, nonetheless, have been dependent on several conditions, including "necessary government approvals." No such approval was obtained and, given the history of the airport project, none would have been forthcoming. In addition, the trial court also noted that the letter of intent expired when Pinczkowski failed to sign it before its expiration date had passed and, thus, "cannot be considered 'bonafide.' ' The trial court, therefore, concluded that the letter was merely an "unbinding letter of intent, which is one step removed from an offer," and that it "would not necessarily have lead [sic] to a formal offer, much less an actual sale."

¶ 29. These are reasonable findings. Because the Hertz letter was conditional and had expired, it does not appear to have been an offer, and its use as an indication of fair market value would, indeed, have been purely speculative. Therefore, the trial court did not erroneously exercise its discretion in concluding that this was not a *bona fide* offer and as such correctly excluded the Hertz letter. On appeal Pinczkowski, nonetheless, emphasizes that the Hertz letter has probative value that is unrelated to fair market value and that it should have been permitted. We are not persuaded.

¶ 30. Pinczkowski's first argument, according to which the Hertz letter should have been admitted to show that by purchasing the surrounding properties the County ruined Hertz's assemblage plan and reduced the value of the Pinczkowski property, is not convinc-

ing. Although Pinczkowski argues that she wanted to introduce the Hertz letter merely to show assemblage, she also argues that by allegedly spoiling Hertz's assemblage plan, the County reduced the probable fair market value of her property, which in turn reduced her compensation. It is thus apparent that Pinczkowski essentially was, indeed, trying to use the Hertz letter to show fair market value. As already established, the trial court acted reasonably in concluding that the Hertz letter was not an offer, and that even if it were, it may not be used to show fair market value because it was both expired and conditional and, therefore, entirely speculative for purposes of showing fair market value. *See Fox Wisconsin Theatres*, 253 Wis. at 456–58.

¶ 31. In addition, even if the letter were an offer, and even if it could be used to show fair market value, Pinczkowski's argument still lacks merit because it had been the County's stated public purpose for several years to acquire the Pinczkowski property, as well as the two adjacent properties, as part of the airport expansion project. It was, therefore, not possible for the County to ruin Hertz's plan, but it was, instead, entirely reasonable for the County to assume that Hertz was aware, or should have been aware, of the airport expansion plan.

¶ 32. Pinczkowski's next argument, that the Hertz letter shows why Pinczkowski's experts considered the property that Hertz eventually purchased as a comparable property, is equally unsuccessful. This argument was not raised below and we refuse to address it, *see State v. Rogers*, 196 Wis. 2d 817, 827–29, 539

N.W.2d 897 (Ct. App. 1995) (failure to raise specific challenges in the trial court waives the right to raise them on appeal).

¶ 33. We therefore agree with the trial court's assessment:

> As a matter of law, the Hertz letter of intent cannot be the basis of an expert's opinion. Though expert appraisers may typically rely upon offers, the Court finds that the "offer" here is only a highly speculative letter of intent. Here the letter of intent is not an offer and cannot be reasonably relied upon by the appraiser. As such, it is not admissible evidence despite the appraiser's reliance upon it.

¶ 34. In a related argument, Pinczkowski also contends that she was prejudiced because the jury did not hear that Hertz was interested enough in the Pinczkowski property to contact her. This argument is unconvincing. Even though the Hertz letter was excluded, the jury did hear testimony about Hertz's search for a new property and that Hertz had expressed an interest in the Pinczkowski property. The jury was also told about the property Hertz ultimately purchased, and became familiar with the assemblage theory via a hypothetical in which it was presumed that the County had not purchased the adjacent properties. Therefore, because the jury was, indeed, aware of Hertz's interest in the property, Pinczkowski was not prejudiced by the trial court's ruling regarding the Hertz letter.

*C. Pinczkowski was not entitled to a housing replacement payment.*

¶ 35. Pinczkowski's final argument is that the trial court erred when it determined that she was not

entitled to a housing replacement payment pursuant to Wis. Stat. § 32.19(4)(a). Additionally, Pinczkowski submits that equitable estoppel prevents the County from reneging its offer to pay her the approximately $25,000 that was promised in a letter sent pursuant to the statute.

¶ 36. Wisconsin Stat. § 32.19(1) states that the legislature has declared "that it is in the public interest that persons displaced by any public project be fairly compensated for the property acquired and other losses . . . suffered as the result of programs designed for the benefit of the public as a whole[.]" Section 32.19(4)(a) explains the formula for payment of up to $25,000 for replacement housing:

> **(4)** Replacement housing. (a) *Owner-occupants.* In addition to amounts otherwise authorized by this subchapter, the condemnor shall make a payment, not to exceed $25,000, to any displaced person who is displaced from a dwelling actually owned and occupied, or from a mobile home site actually owned or occupied, by the displaced person for not less than 180 days prior to the initiation of negotiations for the acquisition of the property . . . . A displaced owner may elect to receive the payment under par. (b) 1. in lieu of the payment under this paragraph. Such payment includes only the following:
>
> 1. The amount, if any, which when added to the acquisition payment, equals the reasonable cost of a comparable replacement dwelling available on the private market, as determined by the condemnor.

¶ 37. During the process of acquiring Pinczkowski's property, the County, as required by Wis. Admin. Code § Comm 202.06(6)(a), sent a notice to Pinczkowski in August 1999 setting forth the County's

542

computation of the differential replacement payment. Section COMM 202.06(6)(a) directs:

> An agency shall provide a written notice to occupants indicating the differential replacement payment computation as specified under ss. Comm. 202.68–88 for residential occupants . . . . The notice shall be provided within 90 days of an expected date of vacation or at the request of a displaced person, whichever is sooner.

As noted, because Pinczkowski's lot was larger than a typical lot, and because the lot's highest and best use was not as a residence, the County was required to utilize the "carve out" method.[8] The term carve out is defined in Wis. ADMIN. CODE § COMM 202.01(6) as: "a method for computing a replacement housing . . . payment that is applied to separate the value of a portion of a property acquired[.]"

---

[8] The two occasions requiring complex computations are set forth in Wis. ADMIN. CODE § COMM 202.68(7)(a)2 and (c), together with the methodology to be used. They provide in relevant part:

CARVE-OUT AND MODIFICATION OF REPLACEMENT PAYMENT COMPUTATION. (a) *Complete Acquisition* . . . .

2. Larger than typical size lot. The maximum replacement payment shall be the price of a comparable dwelling on a lot typical for the area, less the price of the acquired dwelling plus the price of that portion of the acquired land which represents a lot typical for the area, when the acquired dwelling is located on a lot size larger than typical for the area.

. . . .

c. *Dwelling on land with higher and better use.* The maximum replacement payment shall be the selling price of a comparable dwelling on a lot typical in the area, less the price of the acquired dwelling, and the price of that portion which represents a lot typical for residential use in the area, when the market value is based on a higher and better use then [sic] residential.

¶ 38. After applying the "carve out" formula, the County calculated that the Pinczkowski home, on a typical lot, represented 57.8% of the value of the total property. The County calculated that a comparable replacement dwelling would cost $79,900; it adjusted this amount by $1,973.53 to reflect market influences on the potential final sales price, which yielded a sum of $77,926.47. It subtracted the carve out amount—57.8% of the proposed sale price of $93,027 from the $77,926.47, and, had a sale occurred at that price, informed Pinczkowski she was entitled to a housing replacement payment of $24,178.47 if she bought a replacement dwelling that cost at least $77,926.47. After purchasing a new home for $155,000, Pinczkowski sought the housing replacement payment. The County refused to pay it, arguing that she was no longer eligible for this payment. The trial court agreed with the County. We agree with the trial court.

¶ 39. As noted, Pinczkowski did not accept the offer of $93,027 for the property, and sold it later for $350,000. Consequently, after applying the 57.8% carve out to the actual price, Pinczkowski is not entitled to any housing replacement payment because the acquisition payment was greater than the home purchased to replace the South Sixth Street property. Contrary to Pinczkowski's contention, the trial court considered the carve out amount in its decision and applied it properly.

> [I]t does appear that based on the ordinance and based on the law, that and the facts here, that the money is not payable because they do in fact, the amount awarded is larger than the carve-out portion of a replacement, as indicated by the argument brief of the plaintiff.
>
> So the Court would find that the defendant is –

strike that – plaintiff is not entitled to the statutory replacement costs under this fact situation.

Additionally, we also note that Pinczkowski, when applying for the housing replacement payment, signed an application that advised her that "any increase in the [b]asic [a]ward attributable to the residential portion shall be computed in the same percentage ratio established in the offering price of the [b]asic [a]ward." Thus, she knew, or should have known, that the carve out percentage, here 57.8%, would be used to decide whether she was eligible for a housing replacement payment, regardless of the purchase price. Thus, her contention that she believed the $53,748 or 57.8% of the $93,027 offer, stated in the letter explaining the housing replacement payment, would remain fixed is unsupported by the record.

¶ 40. Pinczkowski also asserts that she is entitled to the money because the County should be equitably estopped from withholding it. However, the elements of equitable estoppel have not been met here.

■

¶ 41. As set out in *Milas v. Labor Association of Wisconsin, Inc.*, 214 Wis. 2d 1, 11–12, 571 N.W.2d 656 (1997), equitable estoppel has four elements: (1) an action or non-action; (2) on the part of one against whom estoppel is asserted; (3) which induces reasonable reliance thereon by the other, either in action or non-action; and (4) which is to his or her detriment. Pinczkowski contends that the County's letter was a promise to pay her the near maximum housing replacement payment and she relied on it to her detriment. Assuming that equitable estoppel can bind a government agency, *see Village of Hobart v. Brown County*, 2004 WI App 66, 18 n.7, 271 Wis. 2d 268, 678 N.W.2d

402 (noting "equitable estoppel 'is not applied as freely against governmental agencies as it is in the case of private persons' ") (citation omitted), she is mistaken.

¶ 42. First, no promise was ever made to Pinczkowski that she would receive any housing replacement payment, regardless of the sale price of her home. The letter explaining the housing replacement payment formula contained the following information:

A. Replacement Housing Payment

> This payment has been determined to be **$24,178.47**, based on a comparable housing study of houses presently for sale on the real estate market, *provided you sell your house to Milwaukee County for the above stated appraisal amount,* which included a carve-out amount of **$53,748.00**, and you purchase a replacement dwelling which costs at least **$77,926.40**.

(Emphasis added; bold in original). Pinczkowski elected to hold out for a higher award. By doing so, she became ineligible for this housing replacement payment.

¶ 43. Secondly, Pinczkowski could not reasonably have relied on the amount of the payment as fixed, regardless of the sale price. The letter, and the formula set forth in the statute, clearly advised her otherwise. Accordingly, we affirm.

*By the Court.*—Judgments affirmed.

¶ 44. WEDEMEYER, P.J. (*dissenting*). I write separately because, in my opinion, the trial court erred when it determined that the sales of the properties adjacent to the Pinczkowski property were not admissible into evidence. Because the sales were voluntary, arms-length transactions, this evidence should have been admitted. Accordingly, I would reverse on this basis.

## A. Comparable Sales

¶ 45. The arguments of the parties are clearly set forth. Milwaukee County states that Pinczkowski failed to meet her heavy burden of demonstrating that the sales were indeed voluntary. The County also contends that whenever a sale involves an entity possessing the power of eminent domain, that sale can never be considered voluntary and, therefore, cannot be used to establish fair market value. In support of its position, the County relies on three older Wisconsin cases: *Blick v. Ozaukee County*, 180 Wis. 45, 192 N.W. 380 (1923); *Herro v. DNR*, 67 Wis. 2d 407, 227 N.W.2d 456 (1975); and *Kirkpatrick v. State*, 53 Wis. 2d 522, 192 N.W.2d 856 (1972). Pinczkowski, on the other hand, urges this court to acknowledge the difference between this case and the case law presented by the County. Pinczkowski argues that the facts and circumstances here justify making an exception to the general rule of inadmissibility proffered by the County. The majority accepts the County's argument and concludes that established precedent controls this case. My review strongly suggests otherwise.

¶ 46. In my opinion, *Blick*, *Herro* and *Kirkpatrick* do not control disposition of the instant case for the reasons that follow. In *Blick*, the Wisconsin Supreme Court found that "the price paid by the condemnor for similar land, even if proceedings had not been begun, where the purchaser has the power to take by eminent domain, is not admissible." *Id.*, 180 Wis. at 46. The court reasoned that the sale of land purchased by an entity with the power of eminent domain does not represent fair market value because the compromised price may be more or less than fair market value in order to avoid the annoyance, expense, and uncertainty

547

of litigation. *Id.* at 47. However, *Blick* is a case involving a party possessing eminent domain that is actually invoking this power to condemn; therefore, this case does not involve an arms-length transaction and it is not comparable to the present case.

¶ 47. In *Herro,* the court found the prices the DNR paid for comparable property inadmissible into evidence in order to establish fair market value of plaintiff's property. However, the court's rationale had nothing to do with the DNR's power to condemn, but rather, with the fact that the DNR acquired the comparable property under threat of condemnation. *Id.* at 433. In *Herro,* although condemnation proceedings had not begun, "the history of the pending litigation and the prior negotiations clearly indicated that [the] DNR intended to reacquire the property." *Id.* at 431. Thus, the sales of the comparable properties were not voluntary, arms-length transactions.

¶ 48. The County also cites *Kirkpatrick.* This case refers to 4 NICHOLS ON EMINENT DOMAIN § 12.3113(2) (3d ed. 1978), which states, "[i]f a sale is made to [a body] about to institute [condemnation] proceedings if it cannot acquire the land by purchase at a satisfactory price, the amount paid is not a fair test of market value." However, a look at the complete rule gives a better distinction between voluntary sales and those made through condemnation or under threat of condemnation:

> If a sale is made to [a body] about to institute condemnation proceedings if it cannot acquire the land by purchase at a satisfactory price, the price paid is not a fair test of market value. *However, the mere fact that [a body], which purchased land by voluntary sale, was invested with the power of eminent domain does not in*

*and of itself show that the sale was a compulsory settlement rather than a fair transaction in the market.*

5 NICHOLS ON EMINENT DOMAIN § 21.02(6) (emphasis added).

¶ 49. It is true that *Blick, Herro* and *Kirkpatrick* all held that the prices paid in transactions involving condemnation proceedings, or the amount paid by the condemnor for similar land, even if condemnation proceedings have not yet started, is inadmissible. *See, e.g., Blick,* 180 Wis. at 46. Wisconsin courts, however, have not had occasion to consider the admissibility of the purchase price of a comparable property negotiated between a body with the power of eminent domain and a seller in a *voluntary* transaction.[1]

¶ 50. In setting forth her position, Pinczkowski acknowledges that there are three ways in which an entity possessing eminent domain can acquire property. The most extreme way is where the property owner does not consent to the transfer, but rather, the property is transferred to the entity pursuant to a condemnation process (*see* WIS. STAT. § 32.05(7) (2001–02)).[2]

¶ 51. The second method is one of negotiated conveyance before formal initiation of condemnation proceedings (*see* WIS. STAT. § 32.05(2a)). This "negotiated conveyance" is considered a sale under threat of

---

[1] One commentator discusses the "unmaking of a precedent" in suggesting that "some Justices seem to think that treating precedent like silly putty is preferable to acknowledging that it might be in need of revision." Suzanna Sherry, *The Unmaking of a Precedent,* 2003 SUP. CT. REV. 231. The precedent here, in my opinion, is distinguishable and, if not, needs to be revised.

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

condemnation. With this method, certain guidelines are to be followed: The purchaser has to provide the property owner with certain information and materials. Section 32.05(2a). After the acquisition, the property owner is served with a document indicating the property owner has the right to appeal the amount paid. *Id.* In addition, such transactions are exempt from transfer tax. WIS. STAT. § 77.25(12). In fact, deeds recorded from a sale under threat of condemnation must indicate that the transfer was made under threat of condemnation in order to qualify for this tax exemption.

¶ 52. The third alternative for an entity possessing eminent domain is to acquire property in an absolutely voluntary manner, also referred to as an "arms-length transaction." As opposed to the second method, this voluntary alternative does not include the right to appeal the amount paid. It does not allow for a transfer tax exemption, and it will not indicate on the deed that the sale was made under threat of condemnation.

¶ 53. Based on my review, the transactions involving the properties adjacent to the Pinczkowski property were arms-length transactions, pursuant to the third alternative described above. The County entered into standard real estate purchase contracts for each property involved; there was no indication on the deed that the properties were acquired under threat of condemnation as required by WIS. STAT. § 32.05(2a), and the sellers paid transfer taxes.

¶ 54. In addition, the County's expert witness who investigated these sales determined that they were voluntary. In Kevin Zarem's appraisal review of the sale of 5607 South 6th Street and 5673–75 South 6th Street, he stated that "[t]he opportunity to acquire [these] site[s] to alleviate peak seasonal parking problems

prompted the County to *negotiate with the property owner to voluntarily sell their property."* (Emphasis added.)

¶ 55. The issue then becomes whether an exception should be made to the general rule of inadmissibility in condemnation purchases where the sale is voluntary. As noted, Wisconsin has not squarely addressed this issue.

¶ 56. Courts in other jurisdictions, however, that have dealt with this issue of voluntary sales have concluded that certain facts justify making an exception to the general exclusionary rule. In *Slattery Co. v. United States*, 231 F.2d 37, 41 (5th Cir. 1956), the court stated:

> "The prices paid in settlement of condemnation proceedings or the sum paid by the condemnor for similar land, even if proceedings have not been begun, is inadmissible[.]" . . . *The only recognized exceptions to it are in cases where the fact that parties were condemnor and condemnee either was not known or had no influence because the sale was not in connection with, or in anticipation of, condemnation proceedings.*

(Emphasis added.)

¶ 57. In *Cain v. City of Topeka*, 603 P.2d 1031 (Kan. Ct. App. 1979), the landowner used as evidence the prices of land purchased by a hospital, an entity possessing the power of eminent domain, to show the value of his land. The court in this case found that the purchase was an arms-length transaction and therefore the information concerning the purchase is admissible. *Id.* at 1034. The court stated, "[t]he mere fact that the purchaser of land was invested with the power of eminent domain does not in and of itself indicate that the sale was anything other than a fair, arm's length

551

transaction . . . . If the evidence is such as to indicate that an arm's length transaction occurred, then the rule [prohibiting admission] does not apply." *Id.* (Citations omitted.)

¶ 58. In *Covina Union High School Dist. v. Jobe*, 345 P.2d 78 (Cal. Ct. App. 1959), the plaintiffs wished to purchase strips of land from defendants to be used to widen a highway. The appellate court affirmed the trial court's decision to admit into evidence the prices paid for other similar strips of land purchased for the same reason by the State of California. *Id.* at 81–82. The appellate court realized that the reason the plaintiffs wished to exclude the prices paid for the other strips of land was because plaintiffs believed that the sales were not voluntary. *Id.* at 81. However, the court found that these purchases were voluntary, and reasoned that there should be no reason why voluntary sales involving parties with the power to condemn do not represent fair market value when compared to transactions involving parties that do not possess the power of eminent domain. *Id.* at 83.

¶ 59. Pinczkowski asserts that we should follow the modern trend in other jurisdictions, which is to closely examine the sales of comparable property purchased by entities possessing eminent domain and make an exception to admit the evidence if the sales are found to be voluntary. *See also Tennessee Valley Auth. v. Easement and Right of Way*, 405 F.2d 305, 307 (6th Cir. 1968) (this case also states the exception in which a sale involving a party with eminent domain is voluntary when not threatened with condemnation. The court found that the sale price of land bought by the school board is admissible because the sale was voluntary).

¶ 60. Based on the reasoning set forth in these foreign referenced cases, I conclude Wisconsin should

follow suit and declare an exception to the general exclusionary rule for admission of comparable sales involving a party possessing eminent domain power where the transaction is voluntary and one of arms length. We need to specifically address this issue and align with the other jurisdictions that permit the exception to the exclusionary rule.

¶ 61. If it is determined that the transaction falls into the third category and is a voluntary, arms-length sale, the exclusionary rule should not control. Rather, because the sale is voluntary, the general rules relative to assessing property value should apply. Comparable sales are the best evidence of value. *United States v. Miller*, 317 U.S. 369, 374–75 (1943), *Olson v. United States,* 292 U.S. 246, 257 (1934). Wisconsin law dictates that evidence of the price paid for comparable property is admissible. *Kamrowski v. State*, 37 Wis. 2d 195, 201–02, 155 N.W.2d 125 (1967). The County contends that comparable sales law can never apply when the buyer has the power of eminent domain because the sale will *never* be voluntary. It ill behooves a court to follow a precedential principle of law for which no rational basis exists. To hold an owner of real estate hostage to an entity that possesses the power of condemnation, even when there is no evidence it intends to exercise such power when negotiating an arms-length transaction, defies every principle of logic and common sense.

¶ 62. Pinczkowski admits that she carries a heavy burden to prove a voluntary sale when the transaction involves an entity possessing the power of eminent domain; however, she also stresses that just because an entity possesses eminent domain, this fact alone should not result in assuming the sale was involuntary. I agree.

553

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

In *Amory v. Commonwealth,* 72 N.E.2d 549, 559–60 (Mass. 1947), the court stated:

> A sale to one having the power either to purchase or to take by eminent domain is not for that reason alone to be excluded . . . . [but] must be scrutinized more closely than one to a party not possessing that power, but if found to be free and voluntary there is no reason why it should be treated differently from one made to such a party.

¶ 63. Therefore, it is necessary to examine the facts and circumstances of the comparable sales. If the comparable sales were voluntary arms-length transactions, the evidence of these transactions is admissible, despite the fact that the buyer possesses the right of eminent domain.

¶ 64. Citing *Transwestern Pipeline Co. v. O'Brien,* 418 F.2d 15 (5th Cir. 1969), the County argues that Pinczkowski failed to meet her burden. In *Transwestern,* the court found that conclusory statements that sales were voluntary were insufficient to carry this heavy burden to demonstrate that the sales were voluntary and were not influenced by the buyer's possession of the power of eminent domain. The County argues that Pinczkowski relies on similar conclusory statements without providing the necessary factual basis to support the claim that the circumstances surrounding the County's acquisition of properties adjacent to the Pinczkowski property were not public knowledge. I disagree. Pinczkowski provided ample facts to conclude that the sales were voluntary. She proffered the following facts in her offer of proof: (1) the purchased properties were sold under standard real estate contracts; (2) the deeds to the purchased properties were not given "in lieu of condemnation"; (3) the sellers paid transfer tax on the sales, which is not

required if the transfer is pursuant to eminent domain; and (4) appraisals of the value of the property were consistent with the sale price indicating a voluntary arms-length transaction. The County simply states this conclusion and never indicates what factual basis is necessary as provided in *Transwestern*. Based on the specific factual assertions proffered in the offer of proof, the instant case is distinguishable from *Transwestern*.

¶ 65. Accordingly, I would reverse on this issue because, in my opinion, the trial court erred in excluding the comparable sales evidence.

## B. Same Project Rule

¶ 66. The County also claims that because the adjacent properties and the Pinczkowski property were purchased as part of the same airport expansion project, this exception cannot be used. The rationale supporting this "same project" rule is that the market value of the condemned property "can be affected, adversely or favorably, by the imminence of the very public project that makes the condemnation necessary." *United States v. Reynolds*, 397 U.S. 14, 16 (1970). As a result, "the compensation to the owner for the taking of his land must be fixed as though the particular public improvement had never been conceived, planned, announced or begun." *Layne v. Speight*, 529 S.W.2d 209, 212 (Tenn. 1975). This requires the exclusion of evidence of the price paid for adjacent land acquired for use in the same public project. *State v. Hodge*, 194 So. 2d 827, 829 (Ala. 1967).

¶ 67. This "same project" rule is not persuasive for several reasons. First, this new issue was not even considered by the trial court—the County did not move to bar the evidence of the sales on this basis. Because it is

raised for the first time on appeal, this court may decline to consider it. *Wirth v. Ehly*, 93 Wis. 2d 433, 443–44, 287 N.W.2d 140 (1980).

¶ 68. Second, the rule would not apply here. The same project rule, WIS. STAT. § 32.09(5)(b), states: "Any increase or decrease in the fair market value of real property prior to the date of evaluation caused by the public improvement for which such property is acquired . . . may not be taken into account in determining the just compensation for the property." Thus, the same project rule states that the impact of a public improvement for which property is taken should not be considered in determining fair market value. The rule does not say, as the County suggests, that sales of property acquired for the same project cannot be considered in estimating fair market value.

¶ 69. Third, assuming that the same project rule did state that sales of property acquired for the same project cannot be considered, at least one of the barred sales was purchased as part of a different project. The property at 5607 South 6th Street, adjacent to the Pinczkowski property to the north, was purchased as part of the Homeowner Protection Program, which funded acquisitions of residential properties for noise abatement, not for airport parking expansion. Therefore, this property was not acquired for the same project as the Pinczkowski property and the same project rule would not apply to this property.

¶ 70. Finally, the County argues that if Wisconsin allows into evidence the sales of comparable property purchased by entities possessing eminent domain if the sales are found to be voluntary, this exception will add to the complexity and length of condemnation proceedings. The result will be longer and more complex trials,

556

an increase in cost and time necessary for discovery, and confusion for the jury. This argument is misplaced.

¶ 71. The jury in a condemnation proceeding has the duty to determine fair market value, often based upon sales of comparable properties. In order for a sale to be considered an indication of market value, the sale must meet various conditions. For example, 7A NICHOLS ON EMINENT DOMAIN § 13.06 states that "[n]either buyer nor seller [can be] under undue pressure to buy or sell"; and "if a sales transaction does not meet the definition of market value,[3] then the sale cannot be used as a market indicator of the probable sale price of the subject property." (Footnote added.)

¶ 72. Thus, determining whether a seller felt under compulsion to sell to an entity with the power of eminent domain would not add anything new to a jury's duty. A jury is capable of determining whether a sale to an entity possessing eminent domain qualifies as a market sale just as it must look at compulsion or other factors indicating whether a sale is a market sale.

## C. Conclusion

¶ 73. In sum, I conclude that in a sales transaction involving a party possessing eminent domain, we should not assume that the party took advantage of this power; rather, we must first ask whether the sale was voluntary or involuntary. If the sale of a comparable property is found to be voluntary, this evidence should be allowed to be admitted into evidence to be used to

---

[3] "By 'fair market value' is meant the amount for which the property could be sold in the market on a sale by an owner willing, but not compelled, to sell, and to a purchaser willing and able, but not obliged, to buy." WIS JI—CIVIL 8100 (1994) (eminent domain: fair market value).

assess fair market value for the land in question, regardless of the eminent domain power. In other words, transactions involving entities with eminent domain power that do not use this power should be treated the same as transactions involving parties that have no eminent domain power.

¶ 74. Accordingly, I respectfully dissent.